UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| KEVIN WILLIAMS,<br>  3710 Fidelis Court<br>  Triangle, Virginia 22172<br><br>    *Plaintiff*,<br><br>      v.<br><br>ABM PARKING SERVICES, INC,<br>  44910 Saarinen Circle<br>  Sterling, Virginia 20166<br><br>    and<br><br>Five Star U Street Metropolitan Washington<br>Airport Parking, LLC<br>  44910 Saarinen Circle<br>  Sterling, Virginia 20166<br><br>  Registered Agent:<br>  CT Corporation System<br>    4701 Cox Road, #285<br>    Glen Allen, Virginia 23060<br><br>    *Defendants*. | Civil Action No. _____ |

## COMPLAINT

### *NATURE OF CLAIM*

1. Plaintiff, Kevin Williams moves for judgment against ABM Parking Services, Inc., and Five Star U Street Metropolitan Washington Airport Parking, LLC, (a joint and single employer hereinafter collectively referred to as "ABM"), to recover declaratory and injunctive relief and monetary damages to redress the deprivation of rights secured to plaintiff by the Americans with Disabilities Act, 42 U.S.C. §§ 12111 *et seq.* and the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §§ 12101 *et seq.* (collectively referred to herein as "the ADA"); by Section 1981 of the Civil Rights Act of 1866 ("Section 1981"); and by Title VII, 42 U.S.C. 2000e *et seq.*

### *PARTIES*

2. Kevin Williams is a United States citizen who is a resident of Triangle, Virginia. On March 26, 1994, Mr. Williams began working in the shuttle bus operations

at National Airport, which is run by the Metropolitan Washington Airport Authority. He continued to work there until the Defendants terminated his employment and/or refused to rehire him when Defendants took over the contract on October 1, 2015.

3. Mr. Williams consistently met or exceeded all of the requirements of his position.

4. ABM Parking Services, Inc., and Five Star U Street Metropolitan Washington Airport Parking, LLC are related corporations which, at all times relevant to this complaint, operated a place of business at Reagan National Airport.

5. Both ABM Parking Services, Inc., and Five Star U Street Metropolitan Washington Airport Parking, LLC, also do business at 515 S. Flower Street, Los Angeles, California 90071 and at 1459 Hamilton Avenue, Cleveland, Ohio 44114.

6. At all times relevant to this complaint, ABM had at least 15 employees and was subject to the provisions of Title VII and the ADA.

## CONDITIONS PRECEDENT

7. Kevin Williams has fulfilled all conditions precedent to the institution of this action. He filed a timely charge with the Equal Employment Opportunity Commission and has received a Notice of Right to Sue (attached hereto as Exhibit A).

## SUMMARY OF FACTS

8. ABM discriminated against Mr. Williams on the basis of disability (both disparate treatment and disparate impact) and/or on the basis of race when it terminated or refused to rehire Mr. Williams.

## FACTS RELATED TO THE ADA CLAIM

9. On May 6, 1999, Kevin Williams became a Shift Supervisor for the parking lot and shuttle bus services at Ronald Reagan National Airport (formerly "National Airport" and hereinafter referred to as "the Airport").

10. Mr. Williams held the position of Shift Supervisor for 16 years. During part of that time the contract was held by Aerolink Transportation. During the remainder of that time, the contract was held by Standard Parking. Therefore, Mr. Williams was an employee of those two contractors, even though his position did not change.

11. In his position as Shift Supervisor, Kevin Williams managed the desk, worked the two-way radio, answered telephones (including taking hourly calls from each of his approximately five drivers), tracked the GPS on the computer to monitor and help with bus routes, entered data in the computer, pulled the daily counts and other information from the computers, scheduled employees, prepared paperwork for the next shift of drivers, co-ordinated lunch breaks for drivers and supervisors, and managed bus operations on a day-to-day basis. Mr. Williams manned the desk that required constant staffing.

12. The primary job duty for the Shift Supervisor is to manage base operations from a desk which requires constant staffing.

13. For approximately 14 years, including the years long before his disability, Mr. Williams rarely, if ever, transported passengers.

14. Mr. Williams did not drive buses in the position since September 2001.

15. Driving buses is not an essential duty of the Shift Supervisor position.

16. In April 2014, Kevin Williams suffered a stroke.

17. On June 6, 2014, Mr. Williams returned to work. He was able to fully perform the requirements of his job, almost all of which could be performed from his desk, which was called "Base One" -- the center of the bus operation.

18. In December 2014, Mr. Williams suffered a second stroke.

19. As a result of Mr. Williams's two strokes, he had left side impairment which made him unable to get his Department of Transportation ("DOT") card that would authorize him to transport passengers.

20. In March 2015, Mr. Williams was able to return to work. Mr. Williams was able to fully perform the requirements of his job, even without a DOT card.

21. Mr. Williams' disability is apparent in that he limps when he walks.

22. ABM's management has often been present and able to observe Mr. Williams in the workplace.

23. ABM's Human Resources manager once said to Mr. Williams, "Looks like you're limping, Kevin. What happened?" She already knew what happened -- that I had had a stroke.

24. Before and after his strokes, Kevin Williams worked hard and efficiently in his job and received good to excellent evaluations for his performance.

25. From 2010 until September 30, 2015, Randy Bond was the Facility Manager for Standard Parking at Reagan National Airport. He was the manager over Kevin Williams.

26. Kevin Williams was one of the best employees who worked under Randy Bond. Mr. Williams was good at his job. He was reliable and punctual. He was aware of everything that was happening in the workplace. He knew what the employer needed to have done, and he got it done. He was a good role model for the employees that he supervised.

27. Randy Bond, Mr. Williams' manager, has stated under penalty of perjury that the information stated in the foregoing paragraph is true.

28. Before assuming the Airport parking and shuttle bus account on October 1, 2015, ABM met with Standard Parking and discussed the status of the employees after ABM took over the contract.

29. Ramon Dijamco and Randy Bond of Standard Parking discussed current employees and positions with Henoke Tsehaye who was continuing on as General Manager of ABM.

30. Standard Parking clearly communicated to ABM that Kevin Williams was a good employee and was able to fully perform the responsibilities of the Shift Supervisor position.

31. Sometime in or about late summer 2015, ABM announced to the Standard Parking employees that they would need to re-apply to keep their positions after ABM took over the contract.

32. On or about August 31, 2015, Kevin Williams took his medical records and driving record to ABM's Human Resources Manager, Nancy Bryce, and explicitly discussed with her and with ABM's General Manager, Henoke Tsehaye, his medical disability.

33. In the conversations referred to in the preceding paragraph, ABM told Mr. Williams that he would not be rehired because he did not have his DOT card that authorized him to transport passengers.

34. Mr. Williams requested that he be permitted to continue to perform his job as he had been doing for years. Mr. Williams explained that transporting passengers had not been required in his job, and he requested that he be able to continue in the job without being required to transport passengers.

35. There were other employees available to transport the passengers so that the Shift Supervisor did not need to do so.

36. Kevin Williams discussed his disability with Nancy Bryce and Henoke Tsehaye and pled to be permitted to continue to do his job.

37. Neither Ms. Bryce, Mr. Tsehaye, nor anyone else at ABM did anything to initiate the reasonable accommodation interactive process with Mr. Williams about whether reasonable accommodations were available.

38. Nancy Bryce responded to Kevin Williams by saying, "Just because Standard Parking accommodated you, does not mean that this new company is going to accommodate you."

39. When Mr. Williams tried to show Ms. Bryce his medical records, she said that she did not need to see them.

40. When Ms. Bryce insisted that ABM would not hire Mr. Williams as a Shift Supervisor, Mr. Williams asked her what other positions were available. Ms. Bryce responded by saying that "All the positions with ABM require a CDL license."

41. Ms. Bryce told Mr. Williams that his position would end at the end of September 2015.

42. Mr. Tsehaye responded to Mr. Williams's plea for continued employment by shaking his head and saying, "You have to have your CDL [commercial drivers'

license]." Mr. Williams explained that he had had his CDL since 1995, but that he is unable to obtain his DOT card to transport passengers because of his two prior strokes. Mr. Tsehaye changed the subject and began asking Mr. Williams questions about his personal life.

43. Kevin Williams told Randy Bond about his conversations with Nancy Bryce and Henok Tsehaye.

44. Mr. Bond agreed with Kevin Williams that ABM was discriminating against him because of his disability.

45. It would not have been difficult for ABM to approach the Metropolitan Washington Airports Authority, if necessary, and request a minor contract amendment to permit disabled employees to continue to work.

46. Mr. Williams was working to support his family, and the loss of his job has been devastating to him.

47. The Shift Manager for the Airport's parking and shuttle bus operations was John McDavid.

48. John McDavid was also disabled.

49. In September 2015, Mr. McDavid interviewed to be able to continue his position at Shift Manager. During that interview, ABM's Human Resources Manager, Nancy Bryce, told Mr. McDavid that ABM would make no accommodations for anyone with disabilities.

50. Mr. McDavid did have his DOT card, and he could transport passengers, even though his job did not require him to do so.

51. On September 23, 2015, Mr. McDavid received an email from ABM.com/careers turning down his application. The email said:

> We received your online application for the 27855 OS-Shuttle Manager on Duty (MOD) -- Reagan Airport position. However, at this time we are not moving forward with your application.

52. ABM gave no reason that Mr. McDavid was not permitted to continue his job.

53. ABM refused to assume or rehire the only two disabled employees who had been working for Standard Parking at the Airport.

54. ABM assumed or rehired most if not all of the other employees who had been working for Standard Parking at the Airport.

55. ABM's current employees are, for the most part, the same employees of the previous contractor.

56. Henoke Tsehaye was the General Manager of Aerolink Transportation, and he is now the General Manager of ABM.

57. Nancy Bryce, ABM's Human Resources Manager, was the Human Resources Manager for a prior contracting company, Aerolink Transportation.

58. There were many other jobs that did not require DOT cards that Kevin Williams could have performed while working for ABM at the Airport.

59. ABM did not discuss with Mr. Williams other positions (e.g., Dispatchers Desk or Revenue Department) to which he could have transferred.

60. ABM moved other employees between positions when it wanted to retain the employees. For instance, when valet parking operations, ABM transferred an employee from that department to work in shuttle buses as a supervisor.

61. On or about October 1, 2015, ABM assumed the Airport parking and shuttle bus account.

62. On or about October 1, 2015, ABM terminated Kevin Williams's employment and/or refused to rehire him.

### FACTS RELATED TO THE TITLE VII AND SECTION 1981 CLAIMS

63. The majority of the employees in the workplace were Ethiopian, Eritrean, Somali, and Sudanese.

64. On three occasions from January 15, 2000, until April 10, 2009, Kevin Williams complained in writing to management about race discrimination related to what he found to be discriminatory treatment from the above-mentioned African employees to himself.

65. The two people that the Employer terminated or refused to rehire were not Ethiopian, Eritrean, Somali, or Sudanese.

66. On July 12, 2016, EEOC investigator Nubia Garcia informed Kevin Williams of allegations made by ABM in its position statement to the EEOC.

67. On July 18, 2016, EEOC investigatory Nubia Garcia sent Mr. Williams an email in which she granted his request to extend the due date for his response to the employer's position of statement. Mr. Williams's response was due at 5:00 p.m. on August 15, 2016.

68. On August 2, 2016, Kevin Williams retained the undersigned attorney to represent him in this matter.

69. On August 3, 2016, the EEOC inadvertently issue a Dismissal and Notice of Rights before Mr. Williams had had filed his response to ABM's position statement.

70. On August 5, 2016, counsel for Mr. Williams reminded the EEOC that Mr. Williams had been given until 5:00 p.m. on August 15, 2016, to respond to ABM's position statement and requested that the matter be re-opened.

71. At 1:53 pm on August 15, 2016, Kevin Williams filed an amended charge of discrimination in which he added to his claim of disability discrimination a claim of race discrimination.

72. On August 18, 2016, the EEOC wrote Mr. Williams and treated his request to have the matter reopened as a request for reconsideration. The EEOC wrote: "Based on the totality of the evidence and after considering the position expressed in your correspondence,... there is no basis for changing the determination of August 3, 2016."

73. Because the EEOC considered the position included in the amended EEOC Charge, both the ADA claim and the race discrimination claim are properly before the court.

## FACTS RELEVANT TO ALL CLAIMS

74. Approximately one month after forcing Kevin Williams out of work, ABM posted his job as available "in house only."

75. Approximately one month after forcing John McDavid out of work, ABM posted his job as available "in house only."

76. ABM's unlawful treatment of Kevin Williams caused him to lose income and benefits and to suffer great distress

77. Mr. Williams was working to support his wife and two minor children, and the loss of this job has been financially and emotionally devastating to him.

78. ABM knew or should have known that its intended conduct would have resulted in Mr. Williams's financial harm and emotional distress.

79. ABM is responsible for the acts of all of its supervisors, managers, and agents, through the doctrine of respondeat superior.

80. ABM's conduct was willful, wanton, and vindictive.

81. As a direct and proximate result of said acts, Mr. Williams has suffered adverse effects including loss of employment, loss of income, loss of other employment benefits, emotional distress, including, but not limited to, severe humiliation and embarrassment, and great expense.

## *CAUSES OF ACTION*

82. Plaintiff realleges each allegation above as though set forth in full herein.

83. The above acts and pattern and practice by defendant, its agents and employees violated the ADA, Section 1981 of the Civil Rights Act of 1866, and Title VII of the 1964 Civil Rights Act.

WHEREFORE, Plaintiff prays that this court:

- Assume jurisdiction of this case;

- Enter a declaratory judgment that the acts and practices of defendant complained of herein are in violation of the laws of the United States;

- Award plaintiff the value of lost wages and fringe benefits, which resulted from defendant's illegal actions (past and future wages);

- Award plaintiff compensatory and punitive damages related to the emotional distress and other harms that Plaintiff suffered as a result of Defendant's illegally terminating his employment and/or refusing to rehire him;

- Award plaintiff the costs of this action, together with reasonable attorney's fees;

- Award, in favor of Plaintiff and against the Defendant, pre-judgment and post-judgment interest on all amounts awarded pursuant to Plaintiff's claims;

- Award such other and further relief as the Court deems just.

*JURY TRIAL DEMAND*

Plaintiff demands a trial by jury.

Respectfully submitted,

October 4, 2016

Sharon Fast Gustafson,
Attorney at Law, PLC
Counsel for Plaintiff
VSB No. 32800
4041 N. 21st Street
Arlington, Virginia  22207-3040
703-527-0147
sharon.fast.gustafson@gmail.com