# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

| | |
|---|---|
| KEVIN WILLIAMS, ) | |
|    Plaintiff, ) | |
| ) | |
|         v. ) | Case No. 1:16cv1259 |
| ) | |
| ABM PARKING SERVICES INC., ) | |
|  et al., ) | |
|    Defendants. ) | |

## MEMORANDUM OPINION

At issue on cross-motions for summary judgment in this employment discrimination case are the following questions:

i. Whether for purposes of the Family Medical Leave Act (the "FMLA") defendants ABM Parking and Five Star are an integrated employer and whether ABM and Five Star are successors-in-interest to their predecessor contractor, Standard Parking;
ii. Whether shuttle bus driving is an "essential function" of the shuttle bus supervisor position within the meaning of the Americans with Disabilities Act ("ADA");
iii. Whether the plaintiff could perform the other "essential functions" of the supervisor position with a reasonable accommodation;
iv. Whether ABM and Five Star violated the ADA by failing to engage in the requisite interactive process of finding a reasonable accommodation;
v. Whether plaintiff has established a prima facie case on his ADA disparate impact claim; and
vi. Whether for purposes of plaintiff's FMLA retaliation claim, plaintiff can establish that defendants had knowledge of plaintiff's prior FMLA leave.

Because there are disputed issues of material fact with respect to certain of these questions, the cross-motions for summary judgment must be denied.

1

**I.**

Plaintiff, Kevin Williams, worked at Ronald Reagan National Airport ("Reagan National Airport") in dispatcher and supervisor roles for approximately 15 years. Defendant Five Star is an LLC with two members: ABM Parking ("ABM") and U Street Parking, Inc. From 2010 to 2015, Five Star held a contract to provide parking services at Reagan National Airport. In 2015, Five Star received a contract to provide shuttle bus services at Reagan National Airport.

In 2010, plaintiff was hired by Standard Parking ("SP") to serve as a night-shift shuttle bus supervisor and dispatcher. In this role, plaintiff was responsible for coordinating bus schedules, monitoring bus drivers to ensure that they were driving their routes in a timely manner, and otherwise managing the operations of the shuttle bus drivers. During plaintiff's 15 years of employment as a shuttle bus supervisor, plaintiff only drove shuttle buses two times.

In April 2014, plaintiff suffered a stroke that left him disabled and forced him to take leave. He returned to work in June 2014 and was able to perform his job satisfactorily until December 2014, when he suffered a second stroke. Following the second stroke, plaintiff attempted to return to his job in December 2014, but was unsuccessful as he had not fully recovered from his second stroke. Accordingly, he took medical leave from February 22, 2015 to May 19, 2015.

In 2015, defendants prepared a bid to take over the shuttle bus contract from SP. As part of their bid, defendants proposed cutting the number of shuttle bus drivers from 75 to 69 and shuttle bus supervisors from nine to seven. Defendants won the contract in

August 2015, almost three months after plaintiff had returned to work as a shuttle bus supervisor with SP. At this time, defendants informed SP's employees that they were required to reapply for positions with defendants.

Plaintiff applied for a shuttle bus supervisor position with defendants in August 2015. After returning to work in May 2015, plaintiff had worked four days a week in the shuttle bus supervisor position and had been allowed to work as a shuttle bus supervisor despite no longer holding a Commercial Driver's License ("CDL") or a Department of Transportation card ("DOT card") that certified he was cleared to drive the shuttle buses. During this period (May-August 2015), plaintiff functioned satisfactorily as a shuttle bus supervisor without driving a shuttle bus.

On August 31, 2015, Plaintiff went to defendants' office to check on the status of his application to work as a shuttle bus supervisor. Defendants' Human Resources Director, Nancy Bryce, asked plaintiff if he could present a CDL or DOT card. When plaintiff responded that he no longer held a CDL or DOT card, Bryce told plaintiff that he was not eligible for the shuttle bus supervisor position. Plaintiff protested and defendants' General Manager, Henok Tsehaye, then had a conversation with plaintiff. After that meeting, plaintiff was not rehired by defendants for the shuttle bus supervisor position.

Plaintiff then filed this action and now, following completion of discovery, he seeks summary judgment on four issues: (i) whether defendants ABM Parking and Five Star are an integrated employer, (ii) whether ABM and Five Star are successors-in-interest to their predecessor contractor, SP, (iii) whether shuttle bus driving is an

3

"essential function" of the shuttle bus supervisor position, and (iv) whether ABM and Five Star failed to engage in the statutorily required interactive process to identify a reasonable accommodation for plaintiff.

Defendants have also filed for summary judgment on certain issues: (i) whether shuttle bus driving is an "essential function" of the shuttle bus supervisor position, (ii) whether the plaintiff could perform the other "essential functions" of the supervisor position with a reasonable accommodation, (iii) whether plaintiff has made out a prima facie case on his disparate impact claim under the ADA, and (iv) whether plaintiff can establish that Five Star had knowledge of plaintiff's prior FMLA leave.

## II.

Two issues — (i) the status of defendants ABM Parking and Five Star as "integrated employers," and and (ii) ABM and Five Star's status as successors-in-interest under the FMLA to SP, the predecessor contractor — are easily disposed of as they are either moot or irrelevant and hence summary judgment is not appropriate on either of these issues.

Plaintiff's motion with respect to ABM and Five Star's status as integrated employers is rendered moot by the parties' stipulation to this fact. Joint Stip. ¶ 6 ("Plaintiff has claimed . . . that ABM Parking was an integrated employer with Five Star. For the purposes of this litigation only, ABM Parking and ABM Aviation agree not to contest that claim."). Because defendants stipulated to this fact and agreed not to contest the stipulation, plaintiff's motion for summary judgment on this issue is moot and must therefore be denied.

4

Plaintiff's second motion seeking summary judgment on the status of defendants as successors-in-interest fails as it is unnecessary for plaintiff to show that defendants are successors-in-interest to SP in order to recover on his FMLA claim. Because the FMLA prohibits retaliation against a "prospective employee for having exercised . . . FMLA rights[,]"42 U.S.C. § 2615(a), plaintiff's retaliation claim can proceed against defendants without the necessity of proving that defendants are successors-in-interest to SP. In other words, an employer need not have employed an individual to retaliate against him for taking protected medical leave. Because defendants' status as successors-in-interest to SP is not material to plaintiff's FMLA retaliation claim, summary judgment must be denied.

### III.

Common to four of plaintiff's ADA claims — (i) failure to engage in the statutorily required interactive process to reach a reasonable accommodation, (ii) failure to make a reasonable accommodation, (iii) discriminatory failure to rehire, and (iv) intentional discrimination through use of job qualifications — is the question whether plaintiff is a "qualified individual" within the meaning of the ADA. According to the ADA, a "qualified individual" is a person "who, with or without *reasonable accommodation*, can perform the *essential functions* of the employment position that such individual holds or desires." 42 U.S.C. § 12111 (emphasis added). There is no dispute that the plaintiff cannot drive shuttle buses because plaintiff no longer holds a CDL or DOT card. Nonetheless, the parties disagree on two questions: (i) whether shuttle bus driving is an "essential function" of the shuttle bus supervisor position, and (ii) whether a

5

"reasonable accommodation" would allow plaintiff to perform the other essential functions of the shuttle bus supervisor position.

The first genuine dispute of material fact is whether driving a shuttle bus, which requires a CDL and DOT card, is an essential job function of the shuttle bus supervisor position. A job function is "essential" within the meaning of the ADA when "the reason the position exists is to perform the function, when there are not enough employees available to perform the function, or when the function is so specialized that someone is hired specifically because of his or her expertise in performing that function." 29 C.F.R. § 1630.2(n)(2).[1] Evidence of a function's "essential" nature includes whether it is listed in the advertised job description, whether the employer deems the function essential, the amount of time spent on the job performing the function, and the consequences of not requiring the employee to perform the function. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3). The employer's assertion concerning which functions are essential to the job is entitled to consideration,[2] but is not, by itself, dispositive; record evidence

---

[1] *See also Tyndall v. National Educ. Centers, Inc. of California*, 31 F.3d 209, 212 (4th Cir. 1994) (defining "essential functions" as those that bear more than a marginal relationship to the job at issue).

[2] *See* 42 U.S.C. § 12111(8) ("[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential."). Defendants argue that their judgment of what qualifies as an "essential function" is entitled to deference. Although other circuits have stated that deference to the employer's judgment is warranted, *see, e.g., Stevens v. Rite Aid Corp.*, 851 F.3d 224, 229 (2d Cir. 2017), the Fourth Circuit has stated that the employer's statements identifyingh job functions as essential are entitled to consideration, but are not dispositive as other record evidence might rebut the employer's evidence. *See Jacobs*, 780 F.3d at 579 (stating that employer job descriptions and statements are evidence to be considered when deciding whether a job function is "essential"). This is a sensible conclusion, for according determinative or strong

describing how employees actually perform their jobs can create an issue of fact as to whether a job function is "essential" under the ADA. *See Jacobs v. N.C. Administrative Office of the Crts.*, 780 F.3d 562, 579-80 (4th Cir. 2015) (relevant evidence creating a dispute of fact can include "the amount of time spent on the job performing the function, the consequences of not requiring the incumbent to perform the function, and the work experience of people who hold the same or similar job.") (quotations omitted).

Defendants argue that driving shuttle buses is an "essential function" of the shuttle bus supervisor position, citing the shuttle bus supervisor job description and the statements of current shuttle bus supervisors and their general manager.[3] Plaintiff counters that the facts on the ground show that shuttle bus driving is not an "essential function" of the position, and that the job does not require that plaintiff have a CDL or DOT card. In support, plaintiff points to the defendants' own "Zonar records" which record the number of times that supervisors and other drivers drive the shuttle buses. Importantly, defendants concede that "Zonar records would be the most accurate" way of

---

deference to an employer's claim concerning a job's essential function could well lead to anomalous results at odds with the actual employment facts.

[3] *See* D. Ex. 24 (On-Line Requisition) ("Will transport customers by shuttle from time to time to ensure coverage or during peak times"). *See also* Decl. Anteneh at ¶9 ("Although I was not required to drive shuttle buses on a daily basis, I believe my ability to drive the bus is critical to ensuring that the shuttle bus operations run smoothly."). The declarations by other supervisors include essentially similar statements. *See* Decl. Sorg at ¶ 11 (same statement); Decl. Debessai at ¶ 9 (same statement). Night shift supervisors offered similar statements. *See* Decl. Johnson at ¶ 10 ("Because I work the overnight shift, it is not unusual at all for me to drive a shuttle bus, particularly to give drivers their lunch break."). *See also* Decl. Tesfaye (General Manager) ¶ 12 ("Although I am not required to drive a shuttle bus every day, I believe my ability to drive a bus is critical to ensuring that the shuttle bus operations run smoothly.").

measuring the amount of time that supervisors spent driving buses,[4] and the Zonar records show that several supervisors did not drive a shuttle bus at all for almost two years, and even those who did drive the shuttle buses did so only rarely.[5] One shuttle bus supervisor did not drive a shuttle bus at all for 19.5 months under defendants' management of the Reagan shuttle bus contract. Defendants respond that supervisors were required to drive more after the first two years of their management. Notably, that increase in driving only occurred after plaintiff subpoenaed the Zonar records, suggesting that the increase may have occurred as a reaction to the initiation of litigation. Defendants also point to Tsehaye's deposition testimony in which he indicated that certain records showed that supervisors showed supervisors drove shuttle buses more often, but even those records he admitted do not record supervisors driving more than

---

[4] *See* Bryce Dep. at 156 *See also* Tsehaye Dep. at 129:
> Q. Okay. And that for every shift, a shuttle bus supervisor will get on a bus and drive typically zero to three times per week?
> A. You can say that.
> Q. And you think that the zonar records are going to bear that out; is that correct?
> A. Yeah, we do a Zonar sweep now. We require everybody to do that. And they record it on their shift reports or whatever. But the zonar equipment is made for that. And whenever they get on the bus they have to do a zonar sweep. And it records their zonar car. This is something that we started. They haven't been consistently doing that. And the airport definitely looks at those records. So we do require every one of them to do a zonar sweep. And then that will be recorded on the zonar —

[5] *See* Doc. 116, P. Ex. 45 (showing Supervisor Abdelatti did no shuttle bus driving for the first 15 months of ABM/FS management; Supervisor Akintujoye did not drive for the first 3.5 months, drove seven times in next 6 months, then did no driving for 3 months; Supervisor Anteneh did not drive a shuttle bus for the first 17 months of ABM/FS management; Supervisor Tesfaye was promoted to supervisor in January 2016 and drove bus five times in 2016; and Supervisor Sorg did no shuttle bus driving for 19.5 months).

zero to three times per week.[6] In any event, the parties' arguments clearly illustrate a dispute of fact over how often, if at all, shuttle bus supervisors drove shuttle buses.

Plaintiff also points to the existence of the Base One supervisor position to show that shuttle bus driving is not essential to the shuttle bus supervisor position. Tsehaye Dep. at 29.[7] Because the supervisor in the Base One position must be at his or her desk at all times, that person does not drive a shuttle bus but nonetheless performs all the other functions of a shuttle bus supervisor. Accordingly, in plaintiff's view, the undisputed existence of the Base One position demonstrates that shuttle bus driving is not an essential function of the shuttle bus supervisor position.

Finally, to show that the shuttle bus supervisor position does not require shuttle bus driving, plaintiff points to the fact that he did not drive a shuttle bus for fourteen years for his previous employer, SP. Although defendants respond that SP's practice is irrelevant because of defendants' leaner staffing model, there is also record evidence indicating that the leaner staffing model was not significantly leaner[8] and that the new staffing model did not significantly alter or impact the way in which the shuttle bus operation at Reagan National Airport operated.[9] Because a jury may conclude that the

---

[6] See Tsehaye Dep. at 129.

[7] At his deposition, Tsehaye stated that during the night shift one supervisor "is at the dispatch desk [Base One] and the other one will be venturing around."

[8] SP employed six or seven drivers on the night shift and defendants employer four or five. See Williams Stmt. P 127; Akintujoye Dep. 42.

[9] Testimony from ABM/FS' general manager Tsehaye indicated that the shuttle bus operation at Reagan National Airport, both before and after the leaner staffing, functioned "pretty much the

9

actual facts concerning operation of shuttle buses by shuttle bus supervisors rebut the defendants' assertion that shuttle bus driving is an essential duty of the shuttle bus supervisor position, a genuine issue of material fact precludes summary judgment on the question whether shuttle bus driving is an "essential function" of the shuttle bus supervisor position. *See Jacobs*, 780 F.3d at 580 (holding that the actual facts about a deputy clerk's job rebutted an employer's assertions about the essential nature of the front counter portion of the role).

The second issue is whether plaintiff could perform the other "essential functions" of the shuttle bus supervisor role with a reasonable accommodation, such as not requiring him to drive shuttle buses or maintain CDL or DOT card certification, and allowing him to be stationed at the non-mobile Base One supervisor position. A reasonable accommodation is one that "enables an individual with a disability . . . to perform the essential functions of [a] position." 29 C.F.R. § 1630.2(o)(1)(ii). The statute expressly contemplates that a reasonable accommodation may require job restructuring, 42 U.S.C. § 12111(9)(B), but the employer is not required to grant an accommodation unless it would enable the employee to perform "*all* essential job functions of [the] position." *Jacobs*, 780 F.3d at 581. Plaintiff's proposed accommodation is to serve as the supervisor at the desk at Base One, a position which must always be manned and therefore does not require shuttle bus driving or a CDL or DOT card.

---

same." Tsehaye Dep. at 53-55. Further testimony from a shuttle bus driver, Alemu, indicates that ABM/Five Star operated the shuttle bus service at Reagan National Airport "just the same way as Standard Parking," which did not have a leaner staffing model. Alemu Stmt. at ¶ 11.

Defendants argue that this accommodation would not allow plaintiff to perform all the other "essential functions" of the shuttle bus supervisor job. First, defendants argue that plaintiff could not drive non-shuttle bus vehicles, and therefore could not perform a mobile supervisor role if requested. Plaintiff contradicts this argument on the basis of record evidence that he is fully licensed to and capable of driving non-commercial vehicles.[10] Second, defendants argue that plaintiff's stroke left him unable to perform the mental tasks required to serve as shuttle bus supervisor, citing plaintiff's application for Social Security benefits which states that he was unable to sustain an ordinary routine and had a seriously limited ability to maintain attention and concentration for extended periods of time. *See* Doc. 120, D. Ex. 30. Because tracking bus schedules and routes and monitoring shuttle buses is indisputably an "essential function" of the shuttle bus supervisor position,[11] defendants argue that plaintiff's inability to perform mental tasks means he was not qualified for the shuttle bus supervisor role even with a reasonable accommodation.[12] Plaintiff argues that he had fully recovered from the fatigue and

---

[10] *See* Nemeth Stmt. ¶ 7; Williams 2d Stmt. ¶ 113; Belinda Stmt. ¶¶ 17-19.

[11] *See* Decl. Negash at ¶ 8 ("[T]he major tasks of the desk component of the Supervisor position . . . requires that a Supervisor stay focused, concentrate, remain alert, and deal with stress.").

[12] Defendants also argue that by virtue of plaintiff's representations in his SSD application, plaintiff should be estopped from arguing he had the mental capacity to perform the shuttle bus supervisor role. This argument fails because plaintiff's SSD application post-dates his application for the shuttle bus supervisor role and so it does not contradict his representations about his mental abilities at the time he applied for the supervisor position. Of course, defendants can question plaintiff at trial concerning statements in his SSD application and make use of any apparent contradiction by arguing to the jury that the contradiction undermines plaintiff's argument that he could perform the essential functions of the shuttle bus supervisor position.

11

memory problems related to his stroke at the time he applied for the shuttle bus supervisor role,[13] and that his work as a shuttle bus supervisor under SP shows that he continued to have the ability to perform his job adequately with an accommodation.[14] Thus, there is a genuine dispute of material fact as to whether at the time defendants declined to rehire plaintiff he was capable of performing the "essential functions" of the shuttle bus supervisor position with a reasonable accommodation.

In sum, there are factual disputes over whether shuttle bus driving is an "essential function" of the shuttle bus supervisor position for which plaintiff applied, and whether the plaintiff could perform the shuttle bus supervisor job with a reasonable accommodation. Accordingly, summary judgment on this issue must be denied.

## IV.

Plaintiff also seeks summary judgment on the issue whether defendants engaged in good faith in the requisite "interactive process to identify a reasonable accommodation" as required by the ADA. *Wilson*, 717 F.3d at 346. An employer's duty to engage in the

---

[13] *See* Belinda Stmt. at ¶ 19 ("When he returned to work in May, . . . [h]is mental functioning and memory were excellent).

[14] *See* Williams 2d Stmt. at ¶ 117 ("When I applied to continue my job as a Supervisor with ABM/Five Star, I was recovered and doing well"); Bond Dep. at 111 ("We let [plaintiff] recover, and then he came back and he was a whole lot better"); *id.* at 112:
> Q. Did you ever tell any other supervisor to sort of keep a close eye on [plaintiff] because of your concerns with his cognitive abilities?
> A. Not cognitive abilities. I told them to make sure that he wasn't stressing himself out too much. But it wasn't — it wasn't his mental functions by any means. Kevin had a bit of a speech impairment because of the stroke. I wanted to make sure that he would be able to answer the phone and talk to people to where they could understand him, and he —and he could. He could also write and he could manipulate the computer. So I just didn't want him overtaxing his — overtaxing himself health-wise, but not mentally.

interactive process is triggered when an employee communicates that he has a disability and that he desires an accommodation, but an employer is not liable for failing to engage in the process if the employee fails to demonstrate the existence of a reasonable accommodation that would allow him to perform the "essential functions" of the position. *Id.* at 346-47. As explained above, there is a genuine dispute of material fact as to whether there was a reasonable accommodation that would have allowed plaintiff to serve in the shuttle bus supervisor position. *See* Part III infra. Were a jury to conclude that the Base One position did not qualify as a reasonable accommodation, then plaintiff's claim for failure to engage in the interactive process would fail because where no reasonable accommodation exists it follows logically that an employer cannot be required to engage in the process. On the other hand, if a jury were to conclude that the Base One position was a reasonable accommodation then plaintiff's claim in this regard might be found to have merit. *Id.* In sum, plaintiff's motion for summary judgment on this issue must be denied. summary judgment in favor of plaintiff on defendant's failure to engage in the interactive process must be denied.

## V.

Defendants also seek summary judgment on plaintiff's disparate impact claim, arguing that plaintiff's claim should be dismissed because it is not supported by statistical evidence that the CDL and DOT card requirements operate to discriminate against

disabled individuals.[15] The ADA does not use the phrase "disparate impact" but defines disability discrimination to include "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities[.]" 42 U.S.C. § 12112(b)(6). The Supreme Court has recognized that "[b]oth disparate-treatment and disparate impact claims are cognizable under the ADA" under § 12112(b)(6). *Raytheon Co. v. Hernandez*, 540 U.S. 44, 519 (2003). To prove a prima facie disparate impact claim under § 12112(b)(6) of the ADA a plaintiff must (i) identify the challenged employment practice or policy, (ii) demonstrate that the practice or policy had an adverse impact on the plaintiff with a disability, and (iii) demonstrate a causal relationship between the identified practice and the disparate impact. *See Gonzales v. City of New Braunfels, Tex.*, 176 F.3d 834 (5th Cir. 1999).

Defendants argue that to establish a prima facie case of disparate impact under the ADA, a plaintiff must present statistical evidence showing that the qualification discriminates against a class of disabled individuals. Yet this argument misunderstands that a disparate impact claim under the ADA differs from a disparate impact claim under other federal statutes, such as Title VII. Under § 12112(b)(6), claims can be brought

---

[15] Defendants also argue that summary judgment on the disparate impact claim is appropriate because plaintiff failed to exhaust his administrative remedies with respect to this claim. The undisputed facts contradict defendants' argument; although plaintiff did not initially allege a disparate impact theory in his administrative charge, the record discloses that after receiving advice of counsel plaintiff informed the EEOC during the administrative process of both disparate impact and disparate treatment theories of disability discrimination. *See* Williams 2d Stmt. at 139-40, 143-45; P. Ex. 102. Accordingly, there is no failure to exhaust as to the disparate impact theory.

either by an individual plaintiff or by a class of individuals. Although the Fourth Circuit has not ruled on this issue, the Fifth and Ninth Circuits have both recognized that an individual advancing an ADA disparate impact claim need not present statistical evidence if he or she can show that a job qualification screens out the plaintiff on the basis of his or her disability. *Gonzales*, 176 F.3d at 839.[16] Defendants cite two cases in support of their contention that statistical evidence is required to make out a disparate impact claim under the ADA: a District of Maryland case, *EEOC v. Freeman*, 961 F. Supp. 2d 783 (D. Md. 2013), and a Fourth Circuit case, *Anderson v. Westinghouse*, 406 F.3d 248 (4th Cir. 2005). Both cases are inapposite because they involve disparate impact claims by Title VII plaintiffs,[17] not ADA plaintiffs, and as explained above the ADA, unlike Title VII, provides a screen out disparate impact theory under § 12112(b)(6) that applies to

---

[16] *Rohr v. Salt River Project Agric. Improvement & Power Dist.*, 555 F.3d 850, 862 (9th Cir. 2009) ([o]nce an employee shows that a qualification standard tends to screen out *an individual* with a disability, the employer shoulders the burden to prove that the challenged standard is job-related") (emphasis added).

[17] Notably, in Fair Housing Act and Title VII cases the statutory requirement that discrimination be "because of" race creates a "robust causality requirement" which, as the Supreme Court has explained "ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from racial disparities they did not create." *Tex. Dep't of Hons. & Cmty. Affairs v. Inclusive Cmties. Project, Inc.*, 135 S. Ct 2507, 2523 (2015) (quotation marks and alterations omitted); *see also De Yeyes v. Waples Mobile Home Park Ltd. Partnership*, 205 F.Supp.3d 782, 793 (E.D. Va. 2016) (holding that "where a policy lawfully targets non-citizens[,] and thereby incidentally affected a Mexican of Latina origin[,] the disparate impact theory can hardly meet the FHA's requirement to show discrimination 'because of' race[.]") By contrast, disparate impact claims under the ADA, unlike those under Title VII, are not designed for the purpose of ferreting out historically entrenched discrimination "because of" a person's disability status; instead the ADA provides for disparate impact liability because many barriers to public participation for the disabled are "facially neutral but may work to effectuate discrimination against disabled persons." *Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996). Thus, although Title VII uses disparate impact as a means of ferreting out unlawful discrimination, disparate impact claims under the ADA are meant to eliminate unnecessary barriers to public participation by the disabled. *Id.*

individuals. Thus, the statutory text and persuasive circuit precedents support plaintiff's contention that statistical evidence is unnecessary to prove a prima facie disparate impact claim under the ADA.

Even if plaintiff need not present statistical evidence to support his screen out claim under the ADA, he must still present sufficient evidence to support his prima facie case. The record shows that defendants' CDL and DOT card requirements operated to screen out disabled individuals from holding shuttle bus supervisor and driver positions. *See* Tsehaye Dep. at 143. The CDL and DOT card requirements do so with good reason for bus drivers, for as the record confirms, drivers need to be able to drive the buses safely and the CDL and DOT card requirements "make sure that somebody is healthy enough to drive safely." *Id.* But where, as with the shuttle bus supervisor position, there is a genuine dispute of material fact over whether shuttle bus driving is an "essential function" of the supervisor position, the requirement that an employee must possess a CDL and DOT card screens out the plaintiff on the basis of his disability. Thus, the dispute between the parties on the disparate impact theory is much the same as it is for the disparate treatment claim, namely whether having a CDL or DOT card and driving the shuttle bus are "essential functions" of the shuttle bus supervisor position.

Where, as here, the plaintiff has shown that a job requirement operates to screen him out on the basis of his disability, the defendants then bear the burden of asserting a business necessity defense. To assert a business necessity defense, the defendants must show that the allegedly discriminatory qualification requirement is (i) job-related, (ii) consistent with business necessity, and (iii) that performance cannot be accomplished

16

with a reasonable accommodation. *Bates*, 511 F.3d at 993 (quoting 42 U.S.C. § 12113(a)). For the reasons explained above, *see* Part III infra, there is a genuine dispute of material fact as to whether the CDL and DOT card requirements are a business necessity for the shuttle bus supervisor position because there is a dispute over whether driving a bus is an "essential function" of the shuttle bus supervisor position.

Because there are genuine disputes of material fact as to whether the CDL and DOT card requirements operate to screen out the plaintiff on the basis of his disability without a business necessity, summary judgment is not appropriate on plaintiff's disparate impact claim.

## IV.

Defendants also seek summary judgment on plaintiff's FMLA claim, arguing that plaintiff cannot show that defendants' decisionmakers knew the plaintiff had previously taken FMLA leave. To state a claim for retaliation under the FMLA, plaintiff must show that (i) he engaged in protected activity known to his employer, (ii) that an adverse employment action was taken against him, and (iii) that there was a causal link between the protected activity and the adverse employment action. *Wright v. Southwest Airlines*, 319 Fed. Appx. 232, 233 (4th Cir. 2009). For there to be a "causal link" between defendants failure to hire plaintiff and plaintiff's protected activity of taking FMLA leave, plaintiff must show that defendants knew that he had taken protected leave. *See Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998).

Viewed in the light most favorable to the plaintiff, the summary judgment record would allow a reasonable jury to infer that defendants, at the time they decided not to

17

rehire plaintiff, knew about plaintiff's previous FMLA leave. Specifically, SP's Operations Manager, Dijamco, knew that plaintiff knew plaintiff had taken FMLA leave. Dijamaco had meetings with defendants about the transition of the shuttle bus contract from SP to defendants and was hired by defendants as their Operations Manager. The record shows that Dijamco had been involved in hiring recommendations at SP and defendants' HR Director, Bryce, had discussed job qualifications with Dijamco. [18] Based on this evidence, a reasonable jury could infer either that Dijamco was a decisionmaker involved in the failure to rehire plaintiff or that Bryce or Tsehaye knew about plaintiff's leave as a result of Dijamco's discussions with them about hiring decisions.

There is also evidence that suggests that Tsehaye, defendants' general manager, was involved in the decision not to rehire plaintiff and that he knew that plaintiff had taken FMLA protected leave. Tsehaye discussed with Bryce the inclusion of a bus driving requirement for the shuttle bus supervisor position, *see* Tsehaye Dep. at 92, and so a reasonable jury could infer that Tsehaye was involved in defendants' hiring process. Further, Tsehaye was present at the meeting between plaintiff and Bryce in August 2015

---

[18] *See* Bond Dep. at 168-69 ("Ramon had gone to a meeting and he just made a comment to Girmay about how they're asking him about how everybody was or – or, you know, asking him about staff."); *id.* ("I think I do recall somebody telling me about how Ramon had been asked his opinions on people."). *See* Tsehaye Dep. at 92:
    Q. . . . I am asking whether you have heard any discussion about whether driving
    buses is an essential function of the shift supervisor position?
    A. In relation to people within the company, especially Nancy, yes.
    Q. Anybody besides Nancy?
    A. The Shuttle Bus Department manager.
    Q. Who is that?
    A. Ramon

at which there was a discussion about the decision not to rehire plaintiff.[19] The record also shows that Tsehaye may well have known plaintiff had taken FMLA protected leave because Dijamco told Tsehaye "that plaintiff was out" of work because plaintiff had a stroke. Tsehaye Dep. 95-96. Plaintiff's second statement corroborates this account; plaintiff stated that Dijamco told him that Dijamco had informed Tsehaye that he was out on leave. Williams Stmt. 2d at ¶ 107. Thus, the current record would allow a reasonable jury to infer that Tsehaye was a joint-decisionmaker with Bryce concerning plaintiff's employment and that Tsehaye knew that plaintiff had taken FMLA leave for the strokes he suffered.[20]

V.

For all the foregoing reasons, plaintiff's and defendants' motions for summary judgment must be denied.

An appropriate Order will issue.

/s/
T. S. Ellis, III
United States District Judge

---

[19] Williams Stmt. ¶¶ 58-59, 70, 74; Tsehaye Dep. at 120-21.

[20] The question whether defendants had knowledge that plaintiff had taken protected FMLA leave is a close one, and as such it may be revisited at the Rule 50 stage.

19